IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

ELBERT WELCH,

      Plaintiff,

  v.                                               Civil Action No.
                                                     9:06-CV-0061 (LEK/DEP)

T. CHARLAN, *et al.*,

      Defendants.

APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

Elbert Welch, *Pro Se*

FOR DEFENDANTS:

HON. ANDREW M. CUOMO          SENTA B. SIUDA, ESQ.
Attorney General of the State        Assistant Attorney General
of New York
615 Erie Boulevard West
Suite 102
Syracuse, NY 13204

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

      Plaintiff Elbert Welch, a prison inmate who is proceeding *pro se* and

*in forma pauperis*, has commenced this civil rights action pursuant to 42

U.S.C. § 1983 against various defendants, including the Commissioner of

the New York Department of Correctional Services ("DOCS") and other high ranking public officials, alleging the existence of constitutional deprivations as well as violations of state laws and regulations.  Welch, a frequent litigator, has commenced many actions in this and other courts most of which center upon his contention that DOCS officials, acting in concert with federal officials, including the Director of the Federal Bureau of Investigation ("FBI"), with the assistance of television networks, broadcasters and sports figures, have conspired for many years to have him murdered.  In this instance Welch complains principally of disciplinary confinement arising out of the issuance of two separate misbehavior reports, one involving an incident which occurred in the prison cafeteria, and the other based upon items confiscated during a search of his cell.  In his complaint plaintiff seeks recovery of $44 million in compensatory and punitive damages as well as temporary injunctive relief and an order that those involved in the actions against him be subjected to criminal prosecution.

    Now that pretrial discovery has been completed, the defendants have moved seeking the entry of summary judgment dismissing plaintiff's complaint, both on the merits and based upon their claim of entitlement to

qualified immunity. Plaintiff has since cross-moved for summary judgment in his favor, as well as for leave to amend his complaint to identify an additional defendant previously sued only as "Tier Review Officer, Lt. John Doe, Clinton C.F. Annex." In reviewing the parties' cross-motions and in light of events which have occurred since the filing of those motions, I find that the granting of *in forma pauperis* ("IFP") status to the plaintiff was improvident, and therefore recommend that it be vacated, *sua sponte*, and that the action be dismissed unless plaintiff prepays the requisite filing fee.

I.      BACKGROUND

Plaintiff is a New York State prison inmate entrusted to the custody of the DOCS; at the times relevant to his constitutional claims plaintiff was designated to the Clinton Correctional Facility ("Clinton") Annex, into which he was transferred sometime in 2005 from the main portion of the facility. *See* Plaintiff's Complaint (Dkt. No. 1) at p. 6, ¶ 6.

Although plaintiff's claims are prefaced by his allegation that he has been subject since 1979 to an ongoing "massive conspiracy" to kidnap and kill him, *see generally* Plaintiff's Complaint (Dkt. No. 1), a contention advanced by Welch in many other of his cases, at the heart of plaintiff's complaint in this matter is disciplinary action taken against him as a result

of two separate incidents both of which took place on January 8, 2006. The first of those occurred in the cafeteria at Clinton when a dispute arose over a piece of chicken which a worker attempted to serve him. Complaint (Dkt. No. 1) at p. 4, ¶ 1; *see also* Defendants' Motion (Dkt. No. 42-4) Exh. B. Plaintiff insisted that the chicken which he was originally to have been given was "deliberately dropped" by the server in order that he might be provided with a substitute piece of tainted chicken which had been "set aside deliberately" for him. Complaint (Dkt. No. 1) at p. 4, ¶ 1. Plaintiff refused to accept the chicken and allegedly began to argue with and swear at the server, who refused to provide him with another piece of meat. Defendants' Motion (Dkt. No. 42-4) Exh. B at p. 25.

Plaintiff was ultimately directed by Corrections Officer T. Charlan to take the chicken, since he was holding up the dinner line. *Id.* When plaintiff refused that request, defendant Charlan then ordered the plaintiff to take the chicken and keep moving, at which point plaintiff complied. *Id.* Plaintiff's continued use of foul language, however, directed at both the server and Charlan, resulted in his being removed from the mess hall and issued a misbehavior report accusing him of several violations including creating a disturbance, harassment, refusing a direct order, and mess hall

and seating violations. *Id.*; *see also* Defendants' Motion (Dkt. No. 42-4) Exh. D at pp. 137-39.

Shortly after the cafeteria incident Corrections Officer R. Lincoln received a call from another prison official directing him to pack up Welch's property from his cell.  Defendants' Motion (Dkt. No. 42-4) Exh. D at p. 110.  In the course of packing up plaintiff's property Officer Lincoln discovered prohibited materials, including an electric razor with a one and one-half inch blade, a money receipt belonging to another inmate, and papers containing another inmate's docket and case numbers.  *Id.*; *see also* Defendants' Motion (Dkt. No. 42-4) Exh. C.  The prohibited items were confiscated and plaintiff was issued a second misbehavior report, charging him with possession of contraband, possession of another inmate's legal papers, and the rendering of unauthorized legal assistance. *Id.*

Following consolidation of the two misbehavior reports, a Tier III disciplinary hearing was held, beginning on January 17, 2006, to address the two reports.[1]  Defendants' Motion (Dkt. No. 42-4) Exh. D.  At the close

---

[1] The DOCS conducts three types of inmate disciplinary hearings.  Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time

of that hearing plaintiff was found guilty of all charges against him, resulting in the imposition of a penalty which included six months of disciplinary confinement in the facility's special housing unit ("SHU"), with a corresponding loss of recreation, package, commissary and telephone privileges, together with an additional recommendation that plaintiff lose three months of good time credits. *Id.* at pp. 137-38. That penalty was subsequently reduced, on administrative appeal, to two months of SHU confinement with a corresponding loss of privileges, with a recommendation the plaintiff forfeit two months of good time credits. Defendants' Motion (Dkt. No. 42-4) Exh. E.

While addressing the two discrete events both occurring on the same date, plaintiff's claims in this action represent an extension of those which have been asserted by him in the many prior actions commenced in this and other courts, alleging the existence of a widespread conspiracy to cause him harm.[2] Typical of plaintiff's allegations regarding this vast

---

in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

[2] A search of relevant court records reveals that dating back to 1996, plaintiff has commenced a total of fourteen actions in this court, and six more in the Western District of New York, as a prison inmate complaining of prison conditions.

6

conspiracy are his claims that:

(1) Codes have been adopted by a seemingly endless network of DOCS employees, other inmates, and other conspirators, including the term "tapioca" in reference to the alleged wiretapping of the telephone in plaintiff's former home by a judge in 1980, and references to the numbers "25, 5, 8, [and] 8-track" which he claims represent "abbreviated ways of making statements concerning [his] former . . . residence . . . and the plot to track or trace the whereabouts of [his] son [then 8 years old] through school records." Plaintiff's Local Rule 7.1 (a)(3) Statement (Dkt. No. 43-4) ¶ 100.

(2) Countless adverse actions have been taken against the plaintiff in prison, including the incident reports at issue, as acts of retaliation for plaintiff's alleged service as an FBI witness in 1979. *See generally* Plaintiff's Complaint (Dkt. No. 1); Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 43-4).

(3) On numerous occasions "[c]onspirators . . . sought to contaminate [plaintiff] through unsuccessful attempts to engage [him] in sexual conduct with [male and female DOCS employees] or homosexual conduct with inmates." Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 43-4) ¶¶ 17-18.

(4) DOCS employees and other inmates have contaminated the plaintiff's food with "bleach and other foreign substances," *see, e.g.,* Plaintiff's Complaint (Dkt. No. 1) at Sec. III, "Injuries," and, he is in imminent danger of death due to such poisoned foods. *See, e.g.*, Plaintiff's Complaint (Dkt. No. 1), at p. 11, ¶ 22. Additionally, to date, plaintiff has contracted "granuloma" in his lungs and hepatitis C as a result of food contamination. Plaintiff's Local Rule 7.1 (a)(3) Statement (Dkt. No. 43-4) ¶¶ 25-29; Plaintiff's Medical Records (Dkt. No. 48) at pp. 2-5.

(5) This conspiracy is also discriminatory in nature and "white inmate[s have been used] to harass and set [plaintiff] up

7

. . . to consummate the conspiracy." Plaintiff's Complaint (Dkt. No. 1) at p. 11, ¶ 26.

(6) Conspirators have adopted the phrase "'give it back' . . . to convey their intent to somehow get the money back that they anticipate [plaintiff] will recover from this conspiracy as damages in lawsuits." Plaintiff's Local Rule 7.1(a)(3) Statement (Dkt. No. 43-4) ¶ 101.

(7) Several of plaintiff's family members have been killed by conspirators "pursuant to the goals of this conspiracy." *Id.* at ¶¶ 75-76.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on January 17, 2006. Dkt. No. 1. As defendants, plaintiff's complaint names former DOCS Commissioner Glenn S. Goord; Clinton Superintendent Dale Artus; Corrections Officers T. Charlan and R. Lincoln; Corrections Captain Brown; and a John Doe defendant, as well as two other federal officials including Alberto Gonzales (incorrectly identified as "Gonzalez"), the former United States Attorney General; and Robert S. Mueller, former Director of the FBI.[3] In his complaint plaintiff alleges a host of constitutional violations, claiming the issuance of allegedly false misbehavior reports, an unreasonable search and seizure of his cell and corresponding seizure of property in violation of

---

[3] Plaintiff's claims against defendants Gonzales and Mueller were dismissed by the court, *sua sponte*, on June 1, 2006. *See* Dkt. No. 12.

8

the Fourth Amendment, and the denial of procedural due process. *See generally* Complaint (Dkt. No. 1). Upon review of plaintiff's complaint and supporting application, his request for IFP status was granted by order issued on June 1, 2006 by Senior District Judge Lawrence E. Kahn. Dkt. No. 12.

On February 29, 2008 the defendants appearing in the action moved for summary judgment seeking dismissal of plaintiff's claims on a variety of bases, including, *inter alia,* qualified immunity. Dkt. No. 42. Plaintiff has since cross-moved for summary judgment in his favor, both on the issue of liability and with respect to damages, and further seeks to name Lieutenant Sawyer, who according to him "was the review officer who determined the [tier] level of the disciplinary hearing" against him, in the place of the defendant previously identified only as a "John Doe". Dkt. No. 43. Defendants have since responded in opposition to plaintiff's cross-motion, alleging it to be without merit. Dkt. No. 46.

The parties' cross-motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

III. DISCUSSION

    A. PLRA Three Strikes Rule

In light of multiple prior findings that this particular plaintiff is precluded by 28 U.S.C. § 1915(g) from proceeding *in forma pauperis*, given his history of frivolous litigation, and the intervening events which are recounted below, I have reviewed the question of whether plaintiff qualifies for IFP status, despite the fact that the issue has not been raised by the defendants.

        1. Three Strikes Provision Generally

Section 1915(g), which was enacted as part of sweeping inmate litigation reform brought about by adoption of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), though engendering far less litigation than some of its PLRA counterparts including, notably, the exhaustion of remedies requirement of 42 U.S.C. § 1997e(a), provides that

> [i]n no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted,

> unless the prisoner is under imminent danger of
> serious physical injury.

28 U.S.C. § 1915(g); *see also Polanco v. Hopkins*, 510 F.3d 152, 153-54 n.1 (2d Cir. 2007). The manifest intent of Congress enacting this "three strikes" provision was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates. *Tafari v. Hues*, 473 F.3d 440, 443-44 (2d Cir. 2007); *Gill v. Pidlypchak*, No. 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, S.J. & Treece, M.J.). The prophylactic effect envisioned under section 1915(g) is accomplished by requiring a prisoner who has had three previous strikes to engage in a cost-benefit analysis in some ways similar to that which other civil litigants must make before deciding whether to commence suit, accompanied by the filing of the full fee – that is, to assess whether the result to be achieved justifies the filing fee expenditure in advance, rather than in installments. *See Ibrahim v. District of Columbia*, 463 F.3d 3, 6 (D.C. Cir. 2006). As the Second Circuit has noted, in the context of PLRA amendments requiring inmates to authorize prison officials to make deductions from inmate accounts to be applied as partial payments of appellate filing fees for prisoners granted *in forma pauperis* status,

> [p]rior to the enactment of the *in forma pauperis*

> amendments, inmates suffered no economic
> disincentive to filing lawsuits. Indeed, the very
> nature of incarceration – prisoners have
> substantial free time on their hands, their basic
> living expenses are paid by the state and they are
> provided free of charge the essential resources
> needed to file actions and appeals, such as paper,
> pens, envelopes and legal materials – has fostered
> a "'nothing to lose and everything to gain'"
> environment which allows inmates indiscriminately
> to file suit at taxpayers' expense.

*Nicholas v. Tucker,* 114 F.3d 17, 20 (2d Cir. 1997), *cert. denied sub nom.*, *Nicholas v. Miller*, 523 U.S. 1126, 118 S. Ct. 1812 (1998) (citations omitted); *see also Gill*, 2006 WL 3751340, at *2.

The question of whether the dismissal of a prior action qualifies as a strike, for purposes of section 1915(g), is a matter of statutory interpretation, and as such a question for the court.[4] *Tafari*, 473 F.3d at F.3d at 442-43. In determining whether a dismissal satisfies the failure to state a claim prong of the statute, implicated in this case, courts have

---

[4] The Second Circuit has expressed its view that the time for determination of "strikes" is only when the section 1915(g) issue is ripe for adjudication, and that because of the potentially significant consequences flowing from such a finding, a court should not, when dismissing an inmate complaint, contemporaneously signal whether the dismissal should count as a "strike" for the purposes of that section. *DeLeon v. Doe,* 361 F.3d 93, 95 (2d Cir. 2004); *see also Snider v. Melindez,* 199 F.3d 108, 115 (2d Cir. 1999) ("We . . . doubt whether the entry of a strike is properly considered at the time an action is dismissed.").

12

drawn upon the provisions of Rule 12(b)(6) of the Federal Rules of Civil Procedure for guidance, particularly in light of the similarity in phrasing utilized in the two provisions. *Tafari*, 473 F.3d at 442 (citing *Andrews v. King*, 398 F.3d 1113, 1121 (9th Cir. 2005))

### 2. Application of Section 1915(g)

Without question, plaintiff Welch is subject to the three strikes provision of section 1915(g), and the court need not linger long in addressing this issue. On March 16, 2000, well before the filing of this suit, the question was examined by the Second Circuit Court of Appeals in a decision affirming Senior District Judge Thomas J. McAvoy's dismissal of a complaint in a similar action brought by Welch.[5] *See Welch v. Galie,* 207 F.3d 130, 131-32 (2d Cir. 2000) (affirming *Welch v. Galie*, No. 97-CV-1369, Dkt. Nos. 119, 131 (N.D.N.Y.) (TJM/DRH)); *see also Welch v. Fisher,* No. 07-CV-929, Dkt. No. 8 at 2-3 (N.D.N.Y.) (TJM/DEP) (acknowledging that plaintiff earned three strikes status seven years ago as determined in *Welch v. Galie*); *Welch v. Selsky,* No. 06-CV-812, Dkt. Nos. 49, 51 (N.D.N.Y.) (TJM/DEP) (same) . That finding is entitled to

---

[5] In that decision, the Second Circuit went so far as to determine that one of those dismissals, which occurred before the enactment of section 1915(g), nonetheless constituted a "strike" under the statute. *Galie*, 207 F.3d at 132.

preclusive effect in this action, *see Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 288-89 (2d Cir. 2002), thus eliminating defendants' need to independently establish the existence of three strikes for purposes of this action.

Based upon my finding that plaintiff has filed at least three meritless civil rights complaints while confined as a New York State prison inmate, absent applicability of the imminent danger exception set out in the relevant statute, he is subject to the provisions of 28 U.S.C. § 1915(g) and may properly be required to prepay in full the applicable filing fee in order to pursue his claims in this matter notwithstanding that IFP status was previously conferred. *See McFadden v. Parpan,* 16 F. Supp. 2d 246, 247-48 (E.D.N.Y. 1998).

### 3. Imminent Danger Exception

As a safety valve, obviously intended to protect a prison inmate exposed to potential danger from the harsh consequences of his or her earlier folly, section 1915(g) provides that a prisoner who is in "imminent danger of serious physical injury" may avoid application of the three strikes rule of section 1915(g). *See* 28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 562-63 (2d Cir. 2002). This exception requires a

showing that the prisoner was under such imminent danger at the time of filing; the exception does not provide a basis to avoid application of the three strikes provision on the basis of past harm. *Malik*, 293 F.3d at 562-63. An inmate who claims the benefit of this exception must also show that the danger faced rises to the level of a "serious physical injury." 28 U.S.C. § 1915(g). The imminent danger an inmate faces, moreover, must be real, and not merely speculative or hypothetical. *Johnson v. Barney,* No. 04 Civ. 10204, 2005 WL 2173950, at *1-2 (S.D.N.Y. Sept. 6, 2005) (finding that inmate's allegation of danger at the facility in which he was not housed but though which he may pass on infrequent occasions in the future, did not (establish imminent danger).

The term "serious physical injury", as utilized in section 1915(g), is nowhere concretely defined, although it has been construed by various courts as including a "disease that could result in serious harm or even death[.]" *Ibrahim*, 463 F.3d at 7. In deciding whether to invoke the exception, a court must examine the available pleadings, construed in a light most favorable to the plaintiff, to determine whether the plaintiff has alleged a serious physical injury. *McAlphin v. Toney*, 281 F.3d 709, 710 (8th Cir. 2002). Conditions which have been held to rise to a sufficient

threshold level include denial of treatment for infected gums, resulting in damages of infection, *McAlphin*, 281 F.3d at 710; denial of adequate treatment for Hepatitis C, a "chronic and potentially fatal disease," *Ibrahim*, 463 F.3d at 6-7; and heart palpitations, chest pains and labored breathing, *Ciarpaglini v. Saini*, 352 F.3d 328, 330-31 (7th Cir. 2003) (finding upon reaching the merits, however, that plaintiff's complaint did not state an Eighth Amendment claim).

    Plaintiff's claims in this action stem chiefly from his belief that he was improperly punished for an incident which occurred in the prison mess hall, and later based upon items seized from his cell.  Standing alone, such matters do not implicate the existence of imminent danger of serious physical injury, since they relate to discrete incidents which occurred in the past, with no lingering risk of harm.  *See Abdul-Akbar v. McKelvie,* 239 F.3d 307, 315 (3d Cir. 2001) ("By using the term 'imminent', Congress indicated that it wanted to include a safety valve for the 'three strikes' rule to prevent impending harms, not those harms that had already occurred."); *McFadden*, 16 F. Supp. 2d at 247 (noting that imminent danger must occur at the time the plaintiff seeks to file the suit, and not at the time of the alleged incidents).

16

It is true that plaintiff's complaint makes accusations regarding efforts by prison officials to poison his food, alleging the following:

> I have received information from several inmates that they are aware of a conspiracy to kill me. I have been informed both directly and by words and conduct which I understand, that my food has been tainted on numerous occasions both while being served on the line and while in cell confinement such as my present cell confinement. Inmates and DOCS employees use codes and signs which often involve placing hand or fingers on upper lip or pointing to nose which is intended to refer to the conspiracy to poison by tainted food. I currently have swelling on my upper lip which could well be the result of such tainted food served by conspirators.

Complaint (Dkt. No. 1) at p. 7, ¶ 8. Such allegations on the part of Welch, however, are by no means new to the scene. Indeed, similar allegations were rejected by Senior District Judge Thomas J. McAvoy in his decision dated October 30, 2007, denying IFP status to Welch, the court noting that "[p]laintiff's claim of food poisoning is also wholly unsupported" and adding that allegations similar to those contained in plaintiff's complaint in this action regarding comments and gestures "are patently insufficient to state a claim for relief." *Welch v. Fisher,* No. 07-CV-929 (TJM/DEP), Dkt. No. 8 at p. 4 and n. 7 (N.D.N.Y. 2007); *see also Welch v. Samuels,* No. 02-CV-1077 (TJM/GLS), Dkt. No. 9 at p. 3 (N.D.N.Y. 2002) (finding that

17

Welch's allegations that he is the target of a conspiracy by DOCS employees to kill him were similar to claims raised in previously filed suits dismissed as "patently frivolous" and did not establish the existence of imminent danger). Consequently, while this court did initially invoke the imminent danger of serious physical injury exception when granting IFP status in this case in June of 2006, closer review of plaintiff's allegations, considered in light of subsequent events, convince me that IFP status was improvidently granted, and should be rescinded.[6]

IV.   SUMMARY AND RECOMMENDATION

The plaintiff, an experienced litigator with a history of commencing actions in this and other courts based upon wild and fantastic allegations the vast majority of which have been found to be patently meritless, is subject to the three strikes provision of the PLRA which, absent a finding of imminent danger of serious physical injury, warrants denial of IFP status and the requirement that to proceed with this action he must prepay

---

[6] A recent submission by the plaintiff, filed on May 23, 2008, gives me slight room for pause. Dkt. No. 48. In that submission plaintiff includes results of a January 18, 1999 x-ray revealing clear lung fields, and a subsequent report from October of 2007 revealing the existence of "tiny calcified granulomas in each lung." *Id.* I recommend rejection of this x-ray result as surpassing the threshold of demonstrating imminent danger of serious physical injury, however, in light of the fact that the report goes on to state that "[t]hese tiny calcified granulomas are present on today's exam and are of no clinical significance." *Id.*

the requisite filing fee. Having reviewed the record and found no basis to conclude that plaintiff is in fact exposed to imminent danger of serious physical injury, like other judicial officers who have reviewed allegations by the plaintiff similar to those now raised and his circumstances as a DOCS inmate, I find he does not qualify to proceed *in forma pauperis*, and therefore recommend that the IFP status previously granted in this case be rescinded. Accordingly, it is hereby

RECOMMENDED that the order granting plaintiff IFP status (Dkt. No. 12) be VACATED in relevant part, that plaintiff's complaint (Dkt. No. 1) be DISMISSED as to all defendants and all claims unless Welch pays the requiring filing fee of $350.00 in full within thirty days after the entry of a final order by the district judge addressing this recommendation, and that the parties' cross-motions for summary judgment (Dkt. Nos. 42, 43) be DENIED as moot, without prejudice to renewal if this report is rejected, or plaintiff pays the requisite filing fee within the prescribed period.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL

PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the Clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:    September 24, 2008
          Syracuse, NY

David E. Peebles
U.S. Magistrate Judge